**Opinion issued December 20, 2012.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-11-01058-CR

———————————

**SANTOS ALMANZAR, IV, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 56th District Court**
**Galveston County, Texas**
**Trial Court Case No. 10CR1498**

---

## MEMORANDUM OPINION

A jury convicted Santos Almanzar, IV of murder and sentenced him to life

in prison.[1] In eight issues, Almanzar challenges the trial court's jurisdiction over

---

[1]    *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). Almanzar was not
       sentenced to life without parole.

the case, asserts violations of his constitutional rights, and contests the effectiveness of his trial counsel. We affirm.

## Background

The State charged Almanzar with murder, contending that Almanzar shot Jack Brisco in the head because of a gang rivalry. Because Almanzar was fifteen years old on the date of the shooting, the case began in juvenile court. The State moved to certify Almanzar as an adult and transfer the case to district court. The juvenile court granted the motion and transferred the case to district court.

The evidence presented at trial is discussed in greater detail below, as it is relevant to the issues in this appeal. Generally, the State's evidence at trial tended to show the following: On the day of the murder, Brisco and his girlfriend had car trouble and walked to Palmer House Apartments[2] to call a tow truck from Brisco's cousin's apartment. F. Lopez witnessed Brisco and his girlfriend arrive at the apartment complex and recognized Brisco's tattoos as identifying Brisco as a member or former member of a rival gang. Lopez was joined by Almanzar, whom the State contends is a member of the same gang as Lopez, a rival gang to Brisco's. Almanzar (also called "Pops") was wearing a light tan hoodie and blue jeans, and Lopez (also called "Poncho") was wearing a white t-shirt and blue jeans. When

---

[2] In the record, the apartment complex is also sometimes identified as Palmer Highway Apartments.

Brisco and his cousin's boyfriend, L. Padilla, stepped out of his cousin's apartment, they were confronted by Almanzar and Lopez, who asked if Brisco was a member of the rival gang. When Brisco responded that he was a member of the rival gang, Almanzar shot Brisco in the head. According to the witnesses, there was no sign of argument or struggle before the shooting.

The jury convicted Almanzar of murder and sentenced him to life in prison. This appeal followed.

## Transfer to the District Court

Almanzar contends that the district court did not have jurisdiction over this case because (1) the diagnostic study provided to the juvenile court was incomplete, (2) there was legally and factually insufficient evidence that Almanzar had "sufficient sophistication and maturity" to support transfer to the adult system, (3) the juvenile court abused its discretion in determining that Almanzar had "sufficient sophistication and maturity" to support transfer to the adult system, and (4) the juvenile court did not make specific findings as to the reasons for transfer, as required by section 54.02(h) of the Family Code. The State responds that the trial court did not abuse its discretion in transferring the case to the district court, Almanzar waived his challenge to the completeness of the diagnostic study, and the trial court's order is proper and correct.

## A. Transfer under section 54.02 of the Family Code

Section 54.02 of the Family Code authorizes a juvenile court to waive its exclusive, original jurisdiction and to transfer a juvenile defendant to a criminal district court if:

(1)     the juvenile is alleged to have committed a felony;

(2)     the juvenile was fourteen years or older if the alleged offense is a first degree felony or fifteen years or older if the alleged offense is a second degree felony;[3] and

(3)     after a full investigation and hearing, the juvenile court determines that there is probable cause to believe that the juvenile committed the offense alleged and that because of the seriousness of the offense alleged or the background of the juvenile, the welfare of the community requires criminal proceedings.

*See* TEX. FAMILY CODE ANN. § 54.02(a) (West Supp. 2012); *Delacerda v. State*, No. 01-09-00972-CR, 2011 WL 2931189, at *6 (Tex. App.—Houston [1st Dist.] July 21, 2011, no pet.); *Bleys v. State*, 319 S.W.3d 857, 861–62 (Tex. App.—San Antonio 2010, no pet.). It is undisputed that the first two prongs of section 54.02 are satisfied here: the State charged Almanzar with murder, a first or second degree felony, and Almanzar was fifteen at the time of the murder. *See* TEX. PENAL CODE ANN. § 19.02(c), (d) (West 2011).

The Family Code provides that, before the hearing on the motion to transfer, the juvenile court "shall order and obtain a complete diagnostic study, social

---

[3]     Other criteria may satisfy this prong of the statute, but they are not at issue here.

evaluation, and full investigation of the child, his circumstances, and the circumstances of the alleged offense." *See* TEX. FAMILY CODE ANN. § 54.02(d). In determining whether to transfer the case to district court, the juvenile court considers:

> (1)    whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person;

> (2)    the sophistication and maturity of the child;

> (3)    the record and previous history of the child; and

> (4)    the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court.

TEX. FAMILY CODE ANN. § 54.02(f). If the juvenile court waives jurisdiction, it must "state specifically in the order its reasons for waiver and certify its action, including the written order and findings of the court, and shall transfer the person to the appropriate court for criminal proceedings and cause the results of the diagnostic study of the person ordered under Subsection (d), including psychological information, to be transferred to the appropriate criminal prosecutor." *Id.* § 54.02(h).

## B.    Completeness of diagnostic study

In his first issue, Almanzar contends that the trial court did not comply with section 54.02(d) because the diagnostic study obtained by the court was not

5

"complete." He contends that the study was incomplete because it did not contain medical records associated with Almanzar's ADHD diagnosis. The State responds that Almanzar waived his complaint about the completeness of the diagnostic study by failing to object to the diagnostic study and that the juvenile court did not abuse its discretion by relying on the study, which the forensic psychologist expert, Dr. Boyd, testified was sufficient to allow her to reach the necessary conclusions. We hold that Almanzar has waived his challenge to the completeness of the study.

Appellate challenges to a juvenile court's discretionary waiver of jurisdiction and transfer of a juvenile defendant to criminal district court are governed by the Texas Code of Criminal Procedure and the Texas Rules of Appellate Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 44.47(c) (West 2006); *Pipkin v. State*, 329 S.W.3d 65, 69 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd). To preserve a complaint for appellate review, a party must make a timely request, objection, or motion with sufficient specificity to apprise the trial court of the complaint and to afford the trial court an opportunity to rule on the objection. *See* TEX. R. APP. P. 33.1(a); *Pipkin*, 329 S.W.3d at 69 (citing *Saldano v. State*, 70 S.W.3d 873, 886–87 (Tex. Crim. App. 2002)). Requiring a party to make a complaint to the trial court by a specific and timely objection, request, or motion as a prerequisite to presenting a complaint for appellate review ensures that the trial

court will have an opportunity to prevent or correct errors.  *Pipkin*, 329 S.W.3d at 69 (citing *Gillenwaters v. State*, 205 S.W.3d 534, 537 (Tex. Crim. App. 2006)).

Thus, a defendant must raise any complaint that "the juvenile court failed to consider a complete diagnostic study as required by section 54.02(d) of the Texas Family Code" at the hearing on the request for certification and transfer. *Id.* Failure to do so results in waiver of the complaint on appeal. *Id.* at 69. Because Almanzar did not object to the completeness of the report at the hearing on the State's motion to certify him as an adult and transfer the case to district court, the issue is not preserved for appeal. *See* TEX. R. APP. P. 33.1(a); *Pipkin*, 329 S.W.3d at 69.

We overrule Almanzar's first issue.

## C.    Juvenile court's determination of "sophistication and maturity"

The juvenile court's transfer order includes a finding that Almanzar was "of sufficient sophistication and maturity to support transfer to [the district court]."  In his second and third issues, Almanzar challenges this determination. We review challenges to a juvenile court's findings in a waiver and transfer order under an abuse of discretion standard. *See, e.g.*, *Bleys*, 319 S.W.3d at 861 (citing *State v. Lopez*, 196 S.W.3d 872, 874 (Tex. App.—Dallas 2006, pet. ref'd) and *Faisst v. State*, 105 S.W.3d 8, 12 (Tex. App.—Tyler 2003, no pet.)); *In re C.C.*, 930 S.W.2d 929, 932–33 (Tex. App.—Austin 1996, no writ).

Almanzar's "sophistication and maturity" is one of four factors that juvenile courts consider when deciding whether to transfer the case. *See* TEX. FAMILY CODE ANN. § 54.02(f)(2). In addition to its finding on Almanzar's sophistication and maturity, the juvenile court made findings on two other factors. First, the court found that Almanzar's crime was against a person, rather than property. *See id.* § 54.02(f)(1) (identifying first consideration as "whether the alleged offense was against person or property, with greater weight in favor of transfer given to offenses against the person"). Second, the court found that there was "little, if any, likelihood that the facilities and services available to [the court] could reasonably be expected to rehabilitate [Almanzar] and that there is from the nature of the offense the likelihood that the public is not adequately protected from future such conduct." *See id* § 54.02(f)(4) (identifying fourth consideration as "the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court."). Almanzar does not challenge the juvenile court's findings on these two considerations.

While the juvenile court is required to consider each of the factors listed in section 54.02(f), it is not required to find that each factor is established by the evidence. *See, e.g.*, *In re C.C.*, 930 S.W.2d at 933; *In re D.D.*, 938 S.W.2d 172, 176 (Tex. App.—Fort Worth 1996, no writ); *In re K.D.S.*, 808 S.W.2d 299, 302

8

(Tex. App.—Houston [1st Dist.] 1991, no writ). And "[t]here is no requirement that the trial court specifically find the juvenile mature and sophisticated in order to support the waiver of jurisdiction." *In re M.A.*, 935 S.W.2d 891, 896 (Tex. App.—San Antonio 1996, no writ) (citing *In re D.L.N.*, 930 S.W.2d 253, 257 (Tex. App.—Houston [14th Dist.] 1996, no writ) and *In re K.W.*, 865 S.W.2d 481, 482 (Tex. App.—Tyler 1993, no writ)). Instead, the juvenile court "may order a transfer on the strength of any combination of the criteria" listed in subsection (f). *Hidalgo v. State*, 983 S.W.2d 746, 754 n.16 (Tex. Crim. App. 1999) (citing *United States v. Doe*, 871 F.2d 1248, 1254–55 (5th Cir.), *cert. denied,* 493 U.S. 917, 110 S. Ct. 276 (1989)).

Thus, because the juvenile court found—and Almanzar does not contest—that the nature of the offense, the unlikelihood of rehabilitation, and the danger to the public supported transfer, we may affirm the judgment on this basis even in the absence of evidence establishing Almanzar's maturity and sophistication. *See In re C.C.*, 930 S.W.2d at 934 ("Because the other three findings support the court's ultimate decision to transfer, any factual insufficiency with regard to the court's findings on the two challenged factors is irrelevant."). The issue on appeal, then, is whether the evidence relating to Almanzar's maturity and sophistication weighs so strongly against transfer that the juvenile court abused its discretion in transferring the case despite the presence of the other factors weighing in favor of transfer.

9

In support of his contention, Almanzar asserts that the evidence established that he had a "borderline" IQ and reading abilities equivalent to that of a third grader. Dr. Boyd testified that Almanzar's score on the IQ test she administered was 80—a score "between low average and borderline" with respect to intellectual functioning. She testified that the score was not low enough that Almanzar suffered from mental retardation but that it did indicate "difficulties." She also testified that he read at a third-grade level, had been prescribed medication for treatment of ADHD, and had been in special education classes. She testified that he did not qualify for a learning disability at the time of her examination because there was not a discrepancy between his intellectual potential and achievement, but that he did "have trouble in school." She also testified that he did not have any mental defects or serious mental illness.

Despite his below average intellectual abilities, Dr. Boyd concluded that Almanzar's overall sophistication and maturity level were average in comparison to other juveniles of the same age. She stated that intellectual ability was part of the basis for her assessment of Almanzar's sophistication and maturity, but she also testified as to other factors she considered in evaluating Almanzar's sophistication and maturity, such as his behavior and social interaction with his family, persons of authority, and other juveniles. She testified that in her clinical interview of Almanzar, she asked questions "about everything from school to

10

interactions with peers" and he gave appropriate answers indicating his mental capacity and fitness for the criminal proceedings. Almanzar did not present any controverting expert testimony tending to undermine Dr. Boyd's conclusion that his maturity and sophistication level were on par with that of other juveniles his age.

In light of the evidence tending to show that Almanzar was of average maturity and sophistication for his age, and in light of the juvenile court's unchallenged findings that other factors listed in section 54.02(f) supported transfer of this case to the criminal district court, we hold that the juvenile court did not abuse its discretion in concluding that a discretionary transfer was appropriate. We overrule Almanzar's second and third issues.

**D.     Reasons for transfer in the juvenile court's order**

In his fourth issue, Almanzar contends that the juvenile court's order is fatally defective because it does not include "specific findings as to the reasons for transfer, as required by Family Code Sec. 54.02(h)."

Section 54.02(h) provides in relevant part: "If the juvenile court waives jurisdiction, it shall state specifically in the order its reasons for waiver and certify its action, including the written order and findings of the court, and shall transfer the person to the appropriate court for criminal proceedings . . . ." TEX. FAMILY CODE Ann. § 54.02(h). The juvenile court's order here states that there was a full

11

investigation and hearing, of which Almanzar was given notice and in which Almanzar participated. Based on the evidence at the hearing, the juvenile court made a number of findings, including findings that:

- Almanzar was charged with conduct constituting murder, a first degree felony, *see* TEX. FAMILY CODE ANN. § 54.02(a)(1);

- Almanzar was fifteen years of age at the time of the alleged offense, *see id.* § 54.02(a)(2);

- in light of the full investigation of Almanzar, his circumstances, and the circumstances of the charged offense, there was probable cause to believe that Almanzar committed the charged offense, *see id.* § 54.02(a)(3);

- because of the seriousness of the offense or Almanzar's background, the welfare of the community required criminal proceedings, *see id.*;

- the offense charged against Almanzar was an offense against a person, *see id.* § 54.02(f)(1);

- Almanzar was of sufficient sophistication and maturity to support transfer to the district court, *see id.* § 54.02(f)(2);

- after consideration of the rehabilitative processes available to the juvenile court, there was "little, if any, likelihood" that the facilities and services available to the juvenile court could reasonably be expected to rehabilitate Almanzar, *see id.* § 54.02(f)(4); and

- the public was not adequately protected from similar future conduct by Almanzar, *see id.*

We conclude that these findings are sufficient to comply with section 54.02(h)'s requirement that the juvenile court "state specifically in the order its reasons for waiver." TEX. FAMILY CODE ANN. § 54.02(h); *see In re T.D.*, 817

12

S.W.2d 771, 776–77 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (holding that order stating that trial court considered factors listed in prior version of subsection (f) of section 54.02 was sufficiently specific).[4] We therefore overrule Almanzar's fourth issue.

## Ineffective Assistance of Counsel

In his sixth issue, Almanzar contends that he received ineffective assistance of counsel at his trial.

### A.     Standard of review

In *Strickland v. Washington*, the United States Supreme Court recognized that a criminal defendant has a Sixth Amendment right to effective assistance of counsel, observing the "crucial role" the right to counsel plays in our adversarial system. 466 U.S. 668, 685, 104 S. Ct. 2052, 2063 (1984); *see Ex parte Jimenez*, 364 S.W.3d 866, 882–83 (Tex. Crim. App. 2012). A criminal defendant claiming that his trial counsel was ineffective must prove that (1) trial counsel's performance was deficient, falling below an "objective standard of reasonableness," and (2) the deficient performance prejudiced his defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the

---

[4]     *See also In re C.R.*, No. 01-94-00183-CV, 1995 WL 62846, at *3–4 (Tex. App.—Houston [1st Dist.] Feb. 16, 1995, writ denied) (not designated for publication) (holding that order containing findings on factors listed in prior version of subsection (f) of section 54.02 was sufficiently specific; *R.K.D. v. State*, No. 01-94-00527-CV, 1995 WL 2913, at *5–6 (Tex. App.—Houston [1st Dist.] Jan. 5, 1995, no writ) (not designated for publication) (same).

result of the proceeding would have been different." *Strickland*, 466 U.S. at 687–88, 694, 104 S. Ct. at 2064, 2068; *see Ex parte Jimenez*, 364 S.W.3d at 883.

Because there are "countless ways" to provide effective assistance, our scrutiny of trial counsel's conduct must be highly deferential. *Ex Parte Rogers*, 369 S.W.3d 858, 862 (Tex. Crim. App. 2012) (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065). There is a strong presumption that trial counsel's conduct fell within the wide range of reasonable assistance and that the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065; *see Ex parte Jimenez*, 364 S.W.3d at 883; *Ex parte White*, 160 S.W.3d 46, 51 (Tex. Crim. App. 2004). We review trial counsel's efficacy in light of the totality of the representation from the viewpoint of the time of trial; we may not review trial counsel's conduct through "20/20 hindsight." *Ex parte Jimenez*, 364 S.W.3d at 883.

Trial counsel's ineffectiveness must be proved by a preponderance of the evidence. *Ex Parte Rogers*, 369 S.W.3d 858, 862 (Tex. Crim. App. 2012). "Both the performance and prejudice prongs of the *Strickland* ineffectiveness inquiry are mixed questions of law and fact, but the prejudice prong often contains 'subsidiary questions of historical fact, some of which may turn upon the credibility and demeanor of witnesses.'" *Riley v. State*, 378 S.W.3d 453, 458 (Tex. Crim. App. 2012) (quoting *Kober v. State*, 988 S.W.2d 230, 233 (Tex. Crim. App. 1999) and

citing *Strickland*, 466 U.S. at 698, 104 S. Ct. at 2070). We must show "almost total deference to a trial court's findings of historical facts as well as mixed questions of law and fact that turn on an evaluation of credibility and demeanor." *Id.* (citing *Miller v. Fenton*, 474 U.S. 104, 114–115, 106 S. Ct. 445, 452 (1985), *State v. Krizan–Wilson*, 354 S.W.3d 808, 815 (Tex. Crim. App. 2011), and *Guzman v. State*, 955 S.W.2d 85, 87 (Tex. Crim. App. 1997)).

## B. Asserted errors by trial counsel

Almanzar asserts four specific deficiencies in his trial counsel's representation of him: (1) trial counsel's misstatement that Almanzar was eligible for probation, (2) trial counsel's failure to attack the reliability of an eyewitness's identification of Almanzar in a photographic lineup,[5] (3) trial counsel's failure to litigate Almanzar's competency to stand trial, and (4) trial counsel's decision to call a particular witness.[6] We address each contention below.

---

[5]    Almanzar raises this as four separate complaints, referencing the issue as a "failure to obtain or use [the] record of [the] transfer hearing" to contradict testimony about a witness's identification of Almanzar, a "failure to impeach" the witness's testimony, a "failure to object" to Detective Villareal's testimony that the witness positively identified Almanzar in a photographic lineup, and improperly allowing Detective Villareal to "bolster" the witness's testimony by describing it as a "positive" identification. Because these complaints raise the same or related substantive issues, we address them together.

[6]    Almanzar's counsel at trial is not the same counsel who represented him at the transfer hearing and who did not object to the completeness of the diagnostic study. Almanzar does not contend that he did not receive adequate assistance of counsel at the transfer hearing.

15

## 1.    Availability of probation

Almanzar asserts that his trial counsel "incorrectly inform[ed] both [Almanzar] and the court that [Almanzar] was eligible for probation in this 2010 homicide case." The record contains discussion of the availability of probation by Almanzar's counsel at two stages of the proceedings: voir dire and punishment.

At the voir dire hearing, Almanzar's trial counsel listed the possibility of probation as one of the topics he would need to vet with the jury panel, asking the trial court to afford him more than one hour to conduct his voir dire inquiries. The trial judge informed the parties that she would cover the punishment range with the jury and denied the request for additional time. When Almanzar's trial counsel stated his intention to ask the panel whether they had "any problem with probation that might affect the way they think," the trial judge responded the inquiry would be improper and that the proper question was whether the jury could consider the full range of punishment. She instructed Almanzar that

> the full range of punishment on a first degree murder case is anywhere from five years in the penitentiary up to 99 years or life and a possible 10,000-dollar fine. If you qualify for probation, in other words if you have never been convicted of a felony in this State or any other state, that makes you eligible for probation. Of course, probation is not a guarantee. But you could then ask the Jury if you are convicted for probation for any term of confinement of ten years or less.

The trial judge then asked Almanzar if he understood the full range of punishment on his case, to which he responded affirmatively. Later, the trial judge

asked Almanzar's trial counsel if Almanzar was eligible for probation, and trial counsel responded that Almanzar was eligible for probation. After the jury was brought in for voir dire, the trial judge instructed the jury: "If you find the Defendant guilty and the Defendant shows that they have not been convicted of a felony in this State or any other state, then you can consider – you hear the word – you can consider probation for any sentence of ten years or less."

During the punishment phase of the trial, Almanzar's trial counsel elicited witness testimony seeking probation for Almanzar and offering to assist Almanzar in complying with any terms of probation. The State elicited responsive testimony regarding Almanzar's probation history. Before submitting the punishment phase charge to the jury, the trial court provided the parties with a revised charge that did not include probation, stating: "It's been brought to my attention that murder is not a probation-eligible offense. So, the Defendant cannot get probation from a jury after a conviction on murder." Neither party objected to the revised charge. During deliberations, the jury inquired whether there was "a term of imprisonment that would allow for immediate probation." In response, the trial court referred the jury to the charge.

The record thus establishes that Almanzar's trial counsel misunderstood the law with respect to whether Almanzar could be given probation if convicted of murder and that this misunderstanding was communicated to Almanzar. For

17

purposes of this appeal, we presume that this error constituted a deficiency sufficient to satisfy the first prong of *Strickland*. *See Riley*, 378 S.W.3d at 458 (holding that trial counsel's admitted error in informing defendant in murder prosecution that probation was available satisfied first prong of *Strickland* test). We therefore turn to the second prong of *Strickland*: prejudice.

Analysis of whether a defendant was prejudiced by ineffective assistance of counsel "turns on whether the deficiency made any difference to the outcome of the case." *Id.* Thus, we must determine "whether there was a reasonable probability that the result of the proceedings would have been different had counsel accurately advised appellant." *Id.* Almanzar has not demonstrated a reasonable probability that correct advice from his trial counsel regarding probation would have altered the results of this case. The jury had no ability to give Almanzar probation under any circumstances, and his counsel's advice did not change that.

Almanzar does not assert or identify evidence in the record that he would have pleaded differently if he had been correctly advised or that his trial counsel's misunderstanding of the law affect his defense in any way. *Cf. Ex parte Battle*, 817 S.W.2d 81, 83–84 (Tex. Crim. App. 1991) (finding counsel ineffective and defendant entitled to withdraw guilty plea when counsel assured defendant that he was eligible for probation when he was not); *see also Riley*, 378 S.W.3d at 458 ("When the claim of ineffectiveness relies upon counsel's misunderstanding of the

18

law regarding community supervision, there must be evidence that: the defendant was initially eligible for community supervision; counsel's advice was not given as a part of a valid trial strategy; the defendant's election of the assessor of punishment was based upon his attorney's erroneous advice; and the results of the proceeding would have been different had his attorney correctly informed him of the law."); *Ramirez v. State*, 301 S.W.3d 410, 418 (Tex. App.—Austin 2009, no pet.) (holding that counsel was ineffective when record on appeal included evidence from motion for new trial that laid out all necessary elements, including harm).

Instead, Almanzar contends that the communication of the availability of probation to the jury prior to the punishment phase "gave the prosecution a substantial boost, implicitly lowering the bar for the jury to enter a guilty finding by lending the false assurance that they would not inevitably have to send [Almanzar] to prison if they found him guilty." But the State's burden at the guilt or innocence phase of the trial is not altered by whether or not probation is available; in any instance, the State must prove the elements of the offense "beyond a reasonable doubt." *See* TEX. CODE CRIM. PROC. ANN. art. 38.03 (West Supp. 2012). In the absence of any evidence of such in the record, we may not presume that the jury disregarded the trial court's charge at the guilt or innocence phase of the trial to lower the State's burden because the jury thought probation

19

was available, nor that the jury would have impermissibly raised the State's burden if it had known that probation was not available. *See Miles v. State*, 204 S.W.3d 822, 827–28 (Tex. Crim. App. 2006) ("Third, the trial court's charge to the jury included an accurate and thorough explanation of the presumption of innocence and what it means in a court of law, and, in the absence of evidence to the contrary, we will assume that the jury followed its written instructions."); *see also Taylor v. State*, 332 S.W.3d 483, 492 (Tex. Crim. App. 2011) (stating that appellate courts "presume that the jury understood and followed the court's charges absent evidence to the contrary"). Moreover, the jury's assessment of the maximum penalty available—a life sentence—contradicts Almanzar's contention that the jury was likely swayed by a desire to sentence Almanzar to probation.

Almanzar has not demonstrated that "there was a reasonable probability that the result of the proceedings would have been different" had his counsel advised him accurately with respect to the availability of probation. *See Riley*, 378 S.W.3d at 458; *see also Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Ex parte Jimenez*, 364 S.W.3d at 883.

### 2. Failure to impeach Davis's testimony and photographic lineup identification

Almanzar contends that "[n]o imaginable trial strategy could excuse [trial counsel's] failure to obtain or use" the records from the transfer hearing at trial. Specifically, Almanzar asserts his trial counsel should have used two pieces of

20

evidence from the transfer hearing. The first such piece of evidence is a portion of a synopsis prepared by Officer Krietemeyer of his interview with D. Davis after the shooting, which was read into the record at the transfer hearing. According to Krietemeyer's synopsis, Davis told him that she was headed toward the laundry room of the apartment complex when two men told her to turn around and go in the other direction; she heard a shot a short time later; and she then saw two men running away, one of whom was wearing blue jeans and a tan hoodie and holding a small silver and black gun. Almanzar points out that this evidence might contradict Davis's testimony at trial that she saw the shooting.

Although the transfer hearing record indicates that Davis did not tell Officer Krietemeyer she witnessed the shooting, it is not the case that there is no "imaginable trial strategy" pursuant to which Almanzar's trial counsel might not have raised that issue. Almanzar's strategy at trial for addressing Davis's testimony was not to deny that she witnessed the shooting but to argue instead that she lied about the shooter's identity because the actual shooter was Lopez, whom she knew, feared, and did not want to implicate, whereas she did not know Almanzar. If Davis had not seen the shooting at all, she would not have this asserted motive to falsely identify Almanzar as the shooter. This strategy is not inherently unreasonable given that (1) Lopez testified at trial that he had pled guilty to the offense; (2) Davis's testimony that she witnessed the shooting was consistent with

21

her written statement from the day of the shooting and with another witness's testimony that Davis was present at the time of the shooting and witnessed "the whole thing"; and (3) the record does not provide an apparent motive for Davis to claim to have witnessed the murder if she did not. Additionally, the record before this Court does not establish what, if any, consequences trial counsel may have anticipated from opening the door to discussion of Davis's communications with Officer Krietemeyer, who did not testify at trial.

The next piece of evidence from the transfer hearing that Almanzar contends his counsel should have used at trial is a photographic lineup exhibit. Before trial, Davis identified Almanzar in the lineup, writing "looks similar to shooter" next to his picture. Almanzar contends that this notation indicates that her identification of him in the photographic lineup was less than "positive," as it was described by Officer Villareal.

Although Almanzar asserts that Officer Villareal testified that Davis "positively" identified Almanzar as the shooter, Villareal did not attribute the positive identification directly to Davis and the focus of the identified testimony was the delay between the murder and the police department bringing in Almanzar, not the certainty of any lineup identification. Villareal testified as follows:

> Q. Detective, why didn't you go looking for [Almanzar] to speak to him on the 18th?

22

A.     Because Mr. Almanzar was a juvenile at the time. And we identified him, but we hadn't had the initial witness — we hadn't been able to put them in a lineup to positively identify him at that time. Once I was able to put him in a photo lineup and positively identify him through [an] eyewitness on the scene the day of the shooting, I had to confer with the D.A.'s Office because he was a juvenile. . . .

Again, Almanzar's trial counsel's strategy was to try to persuade the jury that Davis intentionally identified the wrong person as the shooter because she was afraid to identify the actual shooter, Lopez, whom she knew to be in a gang and of whom she was afraid; his strategy was not to persuade the jury that Almanzar was misidentified by Davis because he looked similar to someone else who committed the murder. This strategy is not inherently unreasonable in light of the considerable evidence placing Almanzar at the scene of the shooting and Lopez's confession of guilt.

And, although Almanzar contends that his trial counsel should have used the exhibit from the transfer hearing to support a motion to suppress Davis's out-of-court identification of Almanzar as the shooter, the record does not establish that seeking to suppress her photographic lineup identification was the only reasonable strategy, given that Davis also identified Almanzar as the shooter during her in-court testimony and given trial counsel's strategy of arguing that Davis intentionally identified Almanzar rather than Lopez, who was also included in a photographic lineup presented to Davis, as the shooter.

23

Finally, Almanzar contends that trial counsel's "cross examination permitted or even invited further redirect, giving Villareal an opportunity to non[-]responsively mention the so-called 'positive' identification" and that this amounted to trial counsel "actually bolster[ing] the prosecution's case and witness." But there is nothing inherently unreasonable or improper about a cross-examination that gives the prosecution reason to ask additional questions on redirect, and Almanzar does not identify any specific deficiency in trial counsel's cross-examination or identify any question that raised the issue of how certain Davis's identification of Almanzar was in the photographic lineup. Almanzar provides no basis for us to conclude that his trial counsel was responsible for Officer Villareal's use of the word "positively" in discussing the identification procedure that preceded Almanzar's arrest. Nor can we presume trial counsel's decision not to object to the "positively" description was unreasonable. Counsel may reasonably have determined that the term had little impact in its context but would have had greater impact if he objected, drawing a more definitive connection between the testimony and Davis's identification of Almanzar.

In the absence of any evidence in the record tending to show the reasoning and strategy of Almanzar's trial counsel, Almanzar has not overcome the "strong presumption" that his trial counsel's conduct fell within the wide range of

reasonable assistance in this respect. *See, e.g.*, *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Ex parte Jimenez*, 364 S.W.3d at 883.

### 3. Failure to raise mental health issues

Almanzar next contends that his trial counsel was ineffective with respect to his failure to litigate Almanzar's competency to stand trial. Almanzar does not cite to any evidence that he was not competent to stand trial, nor does he raise any specific contentions about his incompetency. In the absence of any evidence in the record tending to show the reasoning and strategy of Almanzar's trial counsel, Almanzar has not overcome the "strong presumption" that his trial counsel's conduct fell within the wide range of reasonable assistance in this respect. *See, e.g.*, *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Ex parte Jimenez*, 364 S.W.3d at 883.

### 4. Calling Lopez as a witness

Almanzar's final complaint attacks his trial counsel's strategy of calling Lopez as a witness to testify that he had pleaded guilty to murdering Brisco. Almanzar contends that this strategy "backfired." But Almanzar does not identify any other witnesses whom trial counsel could have or should have called to testify or explain how any alternative strategy should have been pursued. Moreover, Lopez offered testimony favorable to Almanzar. Lopez testified that he had pleaded guilty to the murder, that he was alone with Brisco at the time of the

25

murder and Almanzar was not present, and that Almanzar was not a member of his gang, contrary to the State's theory of the murder.

In the absence of any evidence in the record tending to show the reasoning and strategy of Almanzar's trial counsel, Almanzar's vague aspersions, unsupported by relevant citations to the record or legal authority are not sufficient to overcome the "strong presumption" that his trial counsel's conduct fell within the wide range of reasonable assistance in this respect. *See, e.g.*, *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Ex parte Jimenez*, 364 S.W.3d at 883.

We overrule Almanzar's sixth issue.

## Constitutional Rights

In his fifth, seventh, and eighth issues, Almanzar asserts violations of his constitutional rights. In his fifth and eighth issues, he contends that his due process rights were violated by (1) Officer Villareal's description of Davis's identification of Almanzar in a photographic lineup as a positive identification and (2) the court's decision to allow the withdrawal and substitution of Almanzar's counsel before trial. Almanzar also contends that the substitution of counsel violated his Sixth Amendment right to counsel. In his seventh issue, Almanzar contends that his life sentence is cruel and unusual punishment in light of his age at the time of the offense. We address these issues below.

## A. False testimony

"The Due Process Cause of the Fourteenth Amendment can be violated when the State uses false testimony to obtain a conviction, regardless of whether it does so knowingly or unknowingly." *Ex parte Robbins*, 360 S.W.3d 446, 459 (Tex. Crim. App. 2011); *see* U.S. CONST. amend. XIV; *Ex Parte Chavez*, 371 S.W.3d 200, 207–08 (Tex. Crim. App. 2012) (quoting *Robbins*). To support a due-process complaint, the testimony need not be perjured, only false. *Ex Parte Chavez*, 371 S.W.3d at 208. Whether false testimony constitutes a due-process violation turns on two prongs: (1) falsity—i.e., "whether the testimony, taken as a whole, gives the jury a false impression"—and (2) the harm—i.e., whether "there is a 'reasonable likelihood' that the false testimony affected the judgment of the jury." *Id.*

Almanzar's false-testimony complaint relates to the same testimony from Officer Villareal that is discussed above, in which Officer Villareal stated that the reason for the short delay between the day of the murder and the day on which the police "went looking for" Almanzar was that Almanzar was a minor and certain special procedures had to be followed, including conducting a photographic lineup in which a witness at the scene identified Almanzar. Even assuming that Villareal's reference to a positive photographic lineup was necessarily a reference to Davis and that the use of the term "positively" was false and misleading in light of

27

Davis's note that Almanzar's photograph "look[ed] similar to [the] shooter," Almanzar has not demonstrated that the reference affected the outcome of the trial.

A potential defense based on the contention that the shooter was an unidentified third-party who "look[ed] similar to" Almanzar but was not Almanzar would have been contrary to the testimony presented at trial, which was largely consistent with respect to the number and description of people present at the shooting.[7] Likewise, a defense based on the contention that Davis mistook Almanzar for Lopez in the photographic lineup would have been contrary to the evidence, which established that Davis knew Lopez and identified him as the other person at the scene of the crime in a separate photographic lineup. Most importantly, Davis identified Almanzar in person as the shooter during her testimony at trial.

On this record, we cannot find that there is a reasonable likelihood that Officer Villareal's reference to a positive photographic identification affected the outcome of the trial. *See Ex Parte Chavez*, 371 S.W.3d at 209–10. We therefore overrule Almanzar's fifth issue.

---

[7] Lopez's testimony was inconsistent with the other witnesses' testimony because he testified that only he was present at the time of the shooting. But this testimony is also contrary to a contention that another, unidentified third party was present.

## B.    Substitution of counsel

In his eighth issue, Almanzar argues that his Sixth and Fourteenth Amendment rights were violated by the trial court's approval of his request for substitution of his trial counsel. Almanzar's argument is premised on the assumption that Almanzar's trial counsel did not provide him effective representation, whereas his previous counsel would have effectively represented him at trial. But we have already held that Almanzar has not established, on this record, that his trial counsel failed to provide him effective representation. We therefore overrule Almanzar's eighth issue.

## C.    Cruel and unusual punishment

In his seventh issue, Almanzar contends that his life sentence constitutes cruel and unusual punishment in light of his age at the time of the murder.

Almanzar failed to raise his Eighth Amendment challenge in the trial court.[8] After the jury returned its verdict, the trial court informed Almanzar of the jury's

---

[8]    The U.S. Supreme Court recently addressed the constitutionality of two states' mandatory sentencing requirements for life imprisonment without possibility of parole, as applied to juvenile defendants. *See Miller v. Alabama*, — U.S. —, —, 132 S. Ct. 2455, 2460 (2012). *Miller* does not apply directly to Almanzar's case, which did not involve a mandatory sentence or a sentence to life imprisonment without parole. We do not see a basis for concluding that Almanzar's Eighth Amendment complaint—which also relies on other U.S. Supreme Court cases addressing the considerations specific to Eighth Amendment analysis in the context of juvenile defendants—could not be or did not need to be raised prior to the *Miller* opinion; nor has Almanzar made such an argument to this Court in supplemental briefing. *See Rivera v. State*, No. 09-11-00267-CR, 2012 WL 4459459, at *4 (Tex. App.—Beaumont Sept. 26, 2012, pet. filed) ("We are not

sentence and asked Almanzar if there was "any reason why this should not be the legal judgment of the Court." Almanzar and his trial counsel both responded that there was no reason. Nor does Almanzar identify any other place in the record where he raised an Eighth Amendment challenge or other objection to the severity of his sentence at the punishment hearing or in a post-trial motion. Generally, the right to be free from cruel and unusual punishment under the Eighth Amendment is forfeited when a defendant fails to raise the issue in the trial court. *See, e.g.*, *Curry v. State*, 910 S.W.2d 490, 497 (Tex. Crim. App. 1995) (holding that Eighth Amendment challenge to severity of sentence was not preserved for appeal); *Ham v. State*, 355 S.W.3d 819, 825 (Tex. App.—Amarillo 2011, pet. ref'd) (same); *Manuel v. State*, 357 S.W.3d 66, 85 (Tex. App.—Tyler 2011, pet. ref'd) (same); *Russell v. State*, 341 S.W.3d 526, 527–28 (Tex. App.—Fort Worth 2011, no pet.) (same); *Battle v. State*, 348 S.W.3d 29, 30 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (same); *Noland v. State*, 264 S.W.3d 144, 152 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd) (same); *Wynn v. State*, 219 S.W.3d 54, 61 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (same); *Jacoby v. State*, 227 S.W.3d 128, 130 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd); *Castaneda v. State*, 135 S.W.3d

---

persuaded that either *Graham* or *Miller* changed the existing law."). Although Almanzar mentioned in his appellant's brief that the Supreme Court had heard argument in *Miller*, he did not file any briefing raising arguments based on *Miller* after it issued.

30

719, 723 (Tex. App.—Dallas 2003, no pet.) (same); *Solis v. State*, 945 S.W.2d 300, 301–02 (Tex. App.—Houston [1st Dist.] 1997, pet. ref'd) (same, distinguishing cases implicating statutory scheme that calls for automatic sentence and cases in which factfinder has discretion to assess punishment); *see also Rhoades v. State*, 934 S.W.2d 113, 120 (Tex. Crim. App. 1996) (holding that complaint relating to Texas Constitution's prohibition against cruel and unusual punishment was waived).[9]

Although some constitutional error is so fundamental that it may not be waived, an Eighth Amendment challenge to the severity of a criminal defendant's sentence is ordinarily waivable error. *See Curry*, 910 S.W.2d at 497; *Ham*, 355 S.W.3d at 825; *Manuel*, 357 S.W.3d at 85; *Russell*, 341 S.W.3d at 527–28; *Noland*, 264 S.W.3d at 152; *Wynn*, 219 S.W.3d at 61; *Jacoby*, 227 S.W.3d at 130; *Castaneda*, 135 S.W.3d at 723; *Solis*, 945 S.W.2d at 301; *see generally Clark v. State*, 365 S.W.3d 333, 340 (Tex. Crim. App. 2012) (citing *Arizona v. Fulminante*, 499 U.S. 279, 309–10, 111 S. Ct. 1246, 1265 (1991) for the proposition that

---

[9] At least one Texas court has reached the same conclusion in the context of the argument raised by Almanzar—i.e., an argument that a juvenile defendant's sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Garza v. State*, No. 04-11-00891-CR, 2012 WL 5236048, at *2 (Tex. App.—San Antonio Oct. 24, 2012, no. pet. h.) (mem. op., not designated for publication) (holding that defendant waived Eighth Amendment challenge to life without parole sentence for murder committed when defendant was juvenile because he failed to raise issue in trial court). Unlike this case, that case involved a sentence to life imprisonment without parole. *See id.*

31

"fundamental error occurs when certain constitutional rights are violated, such as the right to counsel, the right to an impartial judge, the right for there not to be unlawful exclusion of members of the defendant's race from the grand jury, the right to self-representation at trial, or the right to a public trial"); *Marin v. State*, 851 S.W.2d 275, 279 (Tex. Crim. App. 1993) ("All but the most fundamental rights are thought to be forfeited if not insisted upon by the party to whom they belong. Many constitutional rights fall into this category."), *overruled on other grounds by Cain v. State*, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997); *Deener v. State*, 214 S.W.3d 522, 527 (Tex. App.—Dallas 2006, pet. ref'd) ("Most rights, even constitutional rights, are forfeited if not asserted[.]").[10] Almanzar does not contend that his Eighth Amendment complaint constitutes fundamental error.

Almanzar raises a different argument as to why his Eighth Amendment challenge is not waived. He states,

> The prohibition of cruel and unusual punishments, like that of Double Jeopardy, is not an individual right capable of procedural waiver, but instead is a prohibition on action by the State. Thus, Appellant may raise the issue in this appeal. *Thompson v. Oklahoma*, 487 U.S. 815[, 108 S. Ct. 2687] (1988); *Roper v. Simmons*, 543 U.S. 551[, 125 S. Ct.

---

[10] *See also Gibbs v. State*, No. 01-11-00934-CR, 2012 WL 2159362, at *2 (Tex. App.—Houston [1st Dist.] June 14, 2012, pet. ref'd) (mem. op., not designated for publication) (rejecting contention that error preservation at trial court level is no longer required under recent Court of Criminal Appeals authority).

1183] (2005); *Grah[a]m v. Florida*, — U.S. —, 130 S. Ct. 2011 (2010).[11]

The cited authorities do not support Almanzar's contention. In *Graham*, the defendant expressly raised his Eighth Amendment challenge before the trial court. *Graham*, — U.S. at —, 130 S. Ct. at 2020. Likewise, the defendant in *Roper* raised his Eighth Amendment challenge before the trial court. *Roper*, 543 U.S. at 559, 125 S. Ct. 1183. The opinion in *Thompson* does not specify whether the issue was raised before the trial court or address preservation of error. *Thompson*, 487 U.S. at 820, 108 S. Ct. 2687. Almanzar does not raise any more specific error preservation argument or attempt to show why his Eighth Amendment challenge presents non-waivable error when courts have held that other Eighth Amendment challenges not raised in the trial court were waived.

We do not hold that an alleged Eighth Amendment violation will never constitute fundamental error. But this Court has previously "decline[d] to adopt" the "proposition that an objection is not required to preserve appellate review of an alleged disproportionate sentence," *Jacoby*, 227 S.W.3d at 131, and held that "[i]n

---

[11] To the extent this may be read as raising a fundamental error argument, the argument is inadequately briefed. *See* TEX. R. APP. P. 38.1(i); *see also Young v. State*, No. 01-09-00790-CR, 2012 WL 668927, at *5 (Tex. App.—Houston [1st Dist.] Mar. 1, 2012, pet. ref'd) (mem. op., not designated for publication) (holding that fundamental error argument relating to Eighth Amendment challenge to sentence was waived as inadequately briefed). The authorities cited by Almanzar do not address the issue of fundamental error, and Almanzar does not make any more specific argument as to why the error is so fundamental that it cannot be waived by failure to raise the issue in the trial court.

cases where the sentencing is discretionary," rather than mandated by the applicable sentencing scheme, "it is reasonable to require a trial objection so that the trial court might have an opportunity to cure any error." *Solis*, 945 S.W.2d at 301–02. The record and arguments before this Court do not provide a sound basis for altering that position. We hold that Almanzar has waived his Eighth Amendment complaint.

We overrule Almanzar's seventh issue.

## Conclusion

We hold that Almanzar has not demonstrated that the trial court lacked jurisdiction over this action, that his constitutional rights were violated, or that he did not receive effective assistance of counsel at trial. We therefore affirm the trial court's judgment.

Harvey Brown
Justice

Panel consists of Justices Keyes, Massengale and Brown.

Do not publish. TEX. R. APP. P. 47.2(b).